UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| WENDELL BURTON, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | Civil Action No. 21-cv-11916-ADB |
| KILOLO KIJAKAZI, | * | |
| *Acting Commissioner of the Social* | * | |
| *Security Administration*, | * | |
| | * | |
| Defendant. | * | |
| | * | |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

Wendell Burton ("Claimant") brings this action pursuant to sections 205(g) and

1631(c)(3) of the Social Security Act, 42 U.S.C. § 405(g), challenging the final decision of the

Commissioner of the Social Security Administration denying his claim for Title II Disability

Insurance Benefits ("DIB") and Title XVI Supplemental Security Income ("SSI").  Currently

pending are Claimant's motion to reverse the decision, [ECF No. 13], and Defendant Kilolo

Kijakazi's (the "Acting Commissioner") cross-motion for an order affirming the decision, [ECF

No. 20].  For the reasons set forth below, Claimant's motion is DENIED and the Acting

Commissioner's motion is GRANTED.

I.    **BACKGROUND**

A.    **Statutory and Regulatory Framework: Five-Step Process to Evaluate Disability Claims**

"The Social Security Administration is the federal agency charged with administering

both the Social Security disability benefits program, which provides disability insurance for

covered workers, and the Supplemental Security Income program, which provides assistance for the indigent aged and disabled." Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001) (citing 42 U.S.C. §§ 423, 1381a).

The Social Security Act (or the "Act") provides that an individual shall be considered to be "disabled" if he or she is:

> unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months.

42 U.S.C. § 1382c(a)(3)(A); see also 42 U.S.C. § 423(d)(1)(A).  The disability must be severe, such that the claimant is unable to do his or her previous work or any other substantial gainful activity that exists in the national economy.  See 42 U.S.C. § 1382c(a)(3)(B); 20 C.F.R. § 416.905.

When evaluating a disability claim under the Act, the Commissioner uses a five-step process, which the First Circuit has explained as follows:

> All five steps are not applied to every applicant, as the determination may be concluded at any step along the process.  The steps are: 1) if the applicant is engaged in substantial gainful work activity, the application is denied; 2) if the applicant does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted; 4) if the applicant's "residual functional capacity" [RFC] is such that he or she can still perform past relevant work, then the application is denied; 5) if the applicant, given his or her [RFC], education, work experience, and age, is unable to do any other work, the application is granted.

Seavey, 276 F.3d at 5 (citing 20 C.F.R. § 416.920).

Claimant has the burden of proof through Step Four of the analysis, including the burden to demonstrate RFC.  See Flaherty v. Astrue, No. 11-cv-11156, 2013 WL 4784419, at *8–9 (D. Mass. Sept. 5, 2013).  At Step Five, the Acting Commissioner has the burden of showing the

existence of jobs in the national economy that Claimant can perform notwithstanding his restrictions and limitations.  Goodermote v. Sec'y of Health & Human Servs., 690 F.2d 5, 7 (1st Cir. 1982).

### B.    Procedural Background

Claimant filed his applications for Title II DIB and Title XVI SSI on November 18, 2019. [R. 197–98].[1]  In both applications, he alleged that he became disabled on October 5, 2019.  [R. 207].  The Social Security Administration (the "SSA") denied Claimant's application for benefits on April 30, 2020, and again upon reconsideration on August 11, 2020.  [R. 120–25, 128–33]. Advising physicians to the Disability Determination Service, Drs. Mika and Hom,[2] found that Claimant did not have a severe physical impairment on April 17, 2020, [R. 90–95], and August 11, 2020, [R. 111–13], respectively.

Thereafter, Claimant requested an administrative hearing and a hearing took place before an Administrative Law Judge Carol A. Sax (the "ALJ") on January 5, 2021.  [R. 49–85 (hearing transcript)].  On January 21, 2021, the ALJ found Claimant ineligible for disability insurance benefits.  [R. 14–16].  The SSA Appeals Council denied Claimant's Request for Review on September 21, 2021.  [R. 1–7].  Having exhausted his administrative remedies, Claimant filed a complaint with this Court on November 24, 2021, seeking review of the Acting Commissioner's decision pursuant to 42 U.S.C. § 405(g).  [ECF No. 1].

---

[1] References to pages in the Administrative Record, which were filed electronically at ECF No. 11, are cited as "[R. __ ]."

[2] Claimant's briefs refer to a "Dr. Horn."  See generally [ECF No. 14, 22].  There is no Dr. Horn mentioned in the record and as best as the Court can tell, Claimant meant to refer to Dr. Hom.

### C.       Factual Background

Claimant was 57 years old at the time his alleged disability began.  [R. 86].  He has a twelfth-grade education.  [R. 238].  He reported past employment as a warehouse worker and an assembler at a manufacturing company.  [R. 238].

### D.       Relevant Medical Evidence

Dr. Duncan at Tufts Medical Center has been Claimant's primary care physician since 2003.  [R. 700–03]; see also, e.g., [R. 355, 391, 430].  Dr. Duncan completed an impairment questionnaire on Claimant's behalf on November 23, 2020, [R. 700–03], in which he reported that he has diagnosed and treated Claimant for "glaucoma with severe left eye vision loss" but made no other medical findings, [R. 700].  He also stated in this questionnaire that Claimant should never climb ladders or scaffolds and should avoid unprotected heights and moving mechanical parts due to his vision impairments.  [R. 703].  He also noted that Claimant could only rarely drive in the dark, [id.], and that he could maintain concentration for two-hour increments, but is likely to be "off task for more than 25% of a typical workday[,]" [R. 700].  Additionally, he reported that Claimant could stand or walk for an eight-hour workday, and can lift or carry weights of under 50 pounds.  [R. 701].  Dr. Duncan referred Claimant to eye specialists for his vision concerns.  [R. 355, 391].

#### i.       Claimant's Ophthalmologists

Dr. Duncan referred Claimant to Dr. Sarwat Salim, an ophthalmologist at the New England Eye Center, whom he saw from February to October 2020 to monitor his glaucoma.  [R. 353–55, 359, 368, 717–18].  During the visits in the spring of 2020, Dr. Salim noted that his vision is "blurry and stable," [R. 353–55], and that "[t]he condition[]'s severity is none."  [R.

359].  As of May 6, 2020, Dr. Salim noted that Claimant's vision was blurry, but his condition had not changed since his last visit and that he was "doing well and stable."  [R. 368].

On July 15, 2020, Claimant visited Dr. Salim for an intraocular pressure follow-up visit and reported "some trouble focusing in the morning" and some irritation and itching, but no diplopia[3] and Dr. Salim noted that the affected area was stable with no changes and the irritation was treatable with eye drops.  [R. 395].  His report also indicated that his intraocular pressure was high in the left eye at that point and that Claimant was open to initiating additional therapy for that eye.  [R. 399].

On August 20, 2022, he had another visit with Dr. Salim, during which he reported intermittent blurriness and lack of clarity, but no diplopia and Dr. Salim noted again that "[t]he condition's severity is none."  [R. 672].  He was prescribed a three-day course of ketorolac.  [R. 675].  Approximately a week later, he returned to visit with Dr. Salim, this time reporting achiness affecting his eyes and Dr. Salim reported that the condition's severity was worsening.  [R. 662].  After he underwent a selective laser trabeculoplasty to relieve intraocular pressure on August 26, 2020, Claimant had post-op iritis.  [R. 666].  By September 2, 2020, the iritis was managed.  [R. 519].  Dr. Salim recommended checking intraocular pressure again in two weeks and noted that he would recommend a trabeculectomy if the pressure remained high.  [Id.].  After the intraocular pressure remained high later in September 2020, Dr. Salim advised proceeding with a trabeculectomy.  [Id.].

On September 22, 2020, he underwent a trabeculectomy with mitomycin-C of the left eye that was performed by Dr. Salim.  [R. 597].  During his first postoperative visit, he reported pain

---

[3] Diplopia refers to double vision or "seeing double."  See C. Danchaivijitr & C. Kennard, Diplopia and eye movement disorders, 75 J. NEUROLOGY, NEUROSURGERY & PSYCHIATRY iv24 (2004).

at a level 4 out of 10 and some irritation and redness.  [R. 536].  Dr. Salim noted that his post-procedure intraocular pressure was "great" and advised Claimant to abstain from heavy lifting or bending.  [R. 525].  Claimant visited Dr. Salim again on October 28, 2020 for a one-month follow-up and Dr. Salim noted that Claimant's intraocular pressure had improved.  [R. 715, 718].  Claimant took eyedrops as instructed.  [R. 718].  A day after this visit, Claimant called Dr. Salim's office to ask for a letter excusing him from work until his next appointment in December.  [R. 601].  The resident physician told him that they would not provide such a letter as they believed he was "able to work from an ophthalmic standpoint" and that they would not provide any "extended work letters unless his clinical picture changes."  [Id.].

Then in November 2020, Claimant began seeing Dr. Eliezer Peli for continuing eye care at the New England Eye Center, also on referral from Dr. Duncan.  [R. 711, 713].  On November 24, 2020, Dr. Peli wrote that Claimant reported "difficulty when driving" starting after his September surgery and that he has not driven since, and that he also reported possible difficulties walking due to his vision, including "tripping but not falling," and that these conditions were all affecting his ability to work.  [R. 711].  Dr. Peli remarked that the condition was "mild and moderate."  [Id.].  Dr. Peli conducted an eye exam and concluded that Claimant has a full field by confrontation and substantial peripheral vision, and a "complete normal field OD" that made him "easily qualified for driving."  [Id.].  Dr. Peli advised against night driving, but said that this restriction was voluntary.  [Id.].  This exam also showed that Claimant had 20/30 vision in the right eye and 20/150 vision in the left eye, [R. 708], and that he could read at 20/30 with reading glasses, [R. 713].  Dr. Peli's report also stated that he completed an SSI form for Claimant on this day and remarked that he is "unlikely to be eligible based on vision[.]"  [Id.].

On December 2, 2020, he presented at New England Eye Center to Dr. Salim again for a status post-glaucoma surgery.  [R. 42, 46].  Dr. Salim wrote that "the affected area is doing well and tolerating.  The patient's vision is blurry and [s]till waiting for prescription glasses rx'd by Dr. Peli.  The patient experiences no diplopia.  The complaint is associated with itching.  The affected area is relieved by eye drops.  Patient is following medication instructions."  [R. 42].  He had another visit with Dr. Salim on January 14, 2021, in which his condition was described as "primary open angle glaucoma; right eye mild, left eye severe."  [Id.].  Dr. Salim stated that "the affected area is doing well, stable and tolerating.  Vision is good but blurry in the left eye.   Have a new glasses rx and is waiting on them to pick up."  [Id.].  Claimant also reported that he began experiencing diplopia for both near and distance vision every morning when he wakes up and then several times throughout the day.  [Id.].  He said it affects his daily activities "as they often mistake[] where objects are[]" and also said he suffers from "grainy irritation, itching, light sensitivity, blurriness, excessive tearing, and redness of the left eye."  [Id.].  Symptoms were relieved by artificial tears.  [Id.].[4]

ii.      Other Relevant Medical History

Though his vision issues form the bulk of his relevant medical history, Claimant also reported right hip pain on August 9, 2019.  [R. 303–08].  He was diagnosed with sciatica and treated with Toradol and Flexeril.  [R. 306].  When he presented at Tufts Medical Center again

---

[4] Evidence from pages 32–47 of the record was submitted to the ALJ after the ALJ issued her decision.  [R. 2].  Both parties cited this evidence only for context as it not reviewable in determining whether substantial evidence supports the ALJ's decision, see Mills v. Apfel, 244 F.3d 1, 4–5 (1st Cir. 2001), and Claimant does not allege that the ALJ egregiously erred in her decision-making or that the evidence is new, material, and could not have been submitted earlier, see Soto-Cedeño v. Astrue, 380 F. App'x 1, *4–5 (1st Cir. 2010) (unraised issues are waived).

for this pain on October 23, 2019, he was prescribed Ibuprofen and Flexeril and referred to neurology.  [R. 321–24].

On October 7, 2019, he also presented at Tufts Medical Center and was assessed with cellulitis of the right hand following a cat bite.  [R. 496].  The bite caused some swelling and infection, for which he was prescribed antibiotics and ibuprofen.  [R. 319, 327–28, 453].

### E.    The Hearing

On January 5, 2021, a hearing was held before the ALJ.  [R. 49–85 (hearing transcript)]. Appearances at the hearing were made by Claimant and a vocational expert ("VE").  [R. 50]. Claimant was represented by a non-attorney representative.  [R. 17].

Claimant testified that he last worked in the first week of September 2020.  [R. 58].  He left work for LASIK surgery in the second week of September, followed by his trabeculectomy on September 22.  [R. 58–59, 597].  He said that he "has been trying to get [his] vision back ever since," [R. 58], and that, at the time of his testimony, he had only 10% vision in his left eye and that he expected to eventually lose sight in that eye completely, [R. 69].  He further reported his vision problems were causing issues with stability, balance, and perception and that he was tripping and holding on to bannisters.  [R. 70, 78].  He said he could lift objects, but had difficulty bending.  [R. 73].  With regards to his hands, he testified that he has trouble grasping items, experiences hand cramping, and certain simple activities can be painful, like opening a jar. [R. 74].

The VE testified that Claimant does not have any transferable skills from his past relevant work.  [R. 80].  When asked by the ALJ, the VE further testified that an individual who would be absent four days per month and off-task for more than one hour out of an eight-hour workday, not including breaks, would not be able to maintain any competitive employment.  [R. 84].

Finally, the VE testified that Claimant qualified for the following "medium work" jobs,

- Laundry worker (DOT# 361.684-014) which has approximately 5,500 jobs nationally,
- Laundry laborer (DOT# 361.687-018), which has approximately 15,000 jobs nationally, or
- Kitchen helper (DOT# 318.687-6010), which has approximately 145,000 jobs nationally,

[R. 81], and the following "light work" jobs,

- Cafeteria attendant (DOT# 311.677-010) which has approximately 25,000 jobs nationally, or
- Fountain server (DOT# 319.477-010), which has approximately 170,000 jobs nationally.

[R. 83–84].

### F.    The ALJ's Decision

The ALJ issued a decision on January 21, 2021 finding that, under the five-step

sequential evaluation process, Claimant was not disabled under the Act.  See [R. 14–27].

As a preliminary matter, the ALJ found that Claimant met the insured status requirement

of the Social Security Act through December 31, 2023.  [R. 19].  Then, she proceeded to the

five-step analysis.  At Step One, she determined that Claimant had not engaged in substantial

gainful activity since the alleged onset date of October 5, 2019.  [Id.].[5]

At Step Two, the ALJ determined that Claimant's impairment, open-angle glaucoma of

the bilateral eyes status post left trabeculectomy, is a "severe" impairment as defined by the

regulations, but that any impairments he reported regarding sciatica or hip arthritis or the "cat-

scratch disease" were not severe.  [R. 20].  According to the ALJ, the cat-scratch disease is not

---

[5] Claimant did try to return to work on a couple occasions in 2020, but stopped working each time due to his impairments and medical procedures.  [R. 19].  The ALJ therefore decided that these work attempts were appropriately categorized as unsuccessful work attempts within the meaning of the regulations.  [Id.].

severe because it did not last and was not expected to last for twelve or more months, and had been treated effectively as of January 2020.  [Id.].  With regards to the hip and back impairments, she found that the record was devoid of any medical evidence—such as signs, symptoms, and laboratory findings—apart from his own reported symptoms.  [Id.].  His vision impairments, on the other hand, were found to be severe because they were supported by the evidence of record and "imposed more than a minimal limitation on the [C]laimant's ability to perform basic work activities during the time period in question."  [Id.].

At Step Three, the ALJ found that Claimant does not have an impairment or combination thereof that meets or medically equals the severity of one of the listed impairments described in Appendix 1 of the regulations (20 CFR, Subpart P, Appendix 1).  [R. 20].  In making this determination, the ALJ specifically considered the criteria of sections 2.02–2.04 regarding visual impairments and the opinions of the state agency medical consultants who evaluated this issue in the administrative review process and reached the same conclusion.  [Id.].  She noted that no treating or examining physician of Claimant proffered findings that are equivalent in severity to the criteria of the visual, or any other listed, impairments listed in the regulations.  [Id.].

Next, before proceeding to Step Four, the ALJ concluded that "[C]laimant has the [RFC] to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except that he could occasionally perform tasks that require precise near acuity, precise depth perception, or peripheral vision."  [R. 20].  In reaching this conclusion, she considered "all symptoms and the extent to which his symptoms can be reasonably accepted as consistent with objective medical evidence and other evidence, as well as the medical opinions and prior administrative medical findings."  [Id.].

In considering Claimant's symptoms, the ALJ followed the required two-step process. [R. 21]. After review of the entire record, she first determined that, based on the relevant medical history and his reported symptoms, his medically determinable impairments could reasonably be expected to cause the alleged symptoms; second, however, she determined that his "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" [R. 24].

She found the assessments of Drs. Mika and Hom—who both found that Claimant's impairments were not severe—to be unpersuasive "because they are inconsistent with a record as a whole[]" and noted that those doctors "did not have access to a full longitudinal view of the medical evidence of the record." [R. 24]. In contrast, the ALJ decided that there was sufficient evidence on the record to satisfy the *de minimis* standard of "severity." [Id.]. Moving on, she found Dr. Peli's assessment to be "partially persuasive because it is generally consistent with the [C]laimant's history of effective treatment for his visual impairments, his limited findings upon objective testing and diagnostic studies, and his reasonable range of reported daily activities." [Id.]. She noted that Dr. Peli's status as Claimant's treating ophthalmologist put him "in a strong position to evaluate . . . [Claimant's] work-related abilities and limitations." [Id.].

The ALJ then turned to Dr. Duncan's opinion, which she found to be unpersuasive because the proffered degree of limitation offered by Dr. Duncan is: (1) "inconsistent with the Claimant's history of conservative and/or effective treatment for his impairments" (noting that his visual impairments were "generally managed with medications" and that his September 2020 surgery "appears to have been largely successful" at reducing his interocular eye pressure); (2) "inconsistent with Claimant's limited findings upon physical examination and other diagnostic study"; and (3) "inconsistent with the Claimant's reasonable range of reported daily activities,"

which the ALJ noted included driving a vehicle, shopping for groceries, gardening, and laundry, among others.  [R. 24].

Moreover, the ALJ concluded that any testimony from Claimant regarding any further limitation was unsupported by the record.  [R. 24–25].  Regarding his bilateral open-angle glaucoma, she found that "[o]verall, while the . . . evidence does confirm the presence of some degree of physical limitation, it does not substantiate the [C]laimant's allegations of disabling physical impairments."  [R. 25].  In making this determination, she observed that he "was generally noted to have stable vision and overall clinical presentation"; "he did not make persistent complaints of excessive degrees of pain and irritation"; "[h]is primary complaint appears to have been blurry vision, but his objective testing did not reflect a disabling degree of limitation in this respect"; he "was able to tolerate a trabeculectomy with mitomycin-C of the left eye in September of 2020, and his postoperative treatment records indicate that his IOP has improved to a significant degree"; and "[h]is vision continues to be stable, and he has been advised by his provider that he is 'easily qualified for driving' with a voluntary prohibition against nighttime driving."  [Id.].  Additionally, she noted that the record did not reflect further complaints of side effect from medication or that medical providers have seen a need to make any significant change in the type of medication and also that Claimant reported a range of daily activities that are not generally consistent with his allegations of disabling physical and mental impairments.  [Id.].  She acknowledged Claimant's testimony that sometimes suggested a more limited range of daily activity, but she nevertheless found that two factors outweighed the strength of Claimant's own testimony regarding his limitations.  [Id.].  First, the allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty and, second that, even if Claimant's daily activities are as limited as alleged, it is difficult to attribute that

12

degree of limitation to his medical condition, as opposed to other reasons, "in view of the

relatively weak medical evidence and other factors discussed in this decision." [Id.].  In sum, the

ALJ determined that Claimant has the RFC to perform certain work activities.  [Id.].

And finally, the ALJ determined at Step Four that Claimant does not have the RFC to

perform his past relevant work as a warehouse worker and material handler, [R. 25], but at Step

Five she decided that, considering his age, education, work experience, his RFC, and the

Medical-Vocational Guidelines, Claimant is capable of making a successful adjustment to other

work that exists in significant numbers in the national economy.  [R. 26–27].  In making this

determination, she relied on the VE's testimony that, even with the additional limitations

proffered, Claimant would be able to perform the requirements of occupation such as: laundry

laborer, laundry worker, and kitchen helper.  [Id.].  Therefore, in the end, she concluded that

Claimant is "not disabled" as defined by the Social Security Act.  [R. 27].

## II.    STANDARD OF REVIEW

This Court has jurisdiction pursuant to section 205(g) of the Act, 42 U.S.C. § 405(g).

Section 205(g) provides that an individual may obtain judicial review of a final decision of the

Commissioner of Social Security by instituting a civil action in federal district court.  See 42

U.S.C. § 405(g).  The district court may take a number of actions with respect to the

Commissioner's decision.  First, under sentence four of section 205(g), the court has the power

"to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or

reversing the decision of the Commissioner . . . with or without remanding the cause for a

rehearing."  Id.  A court's decision under sentence four, however, can be based only on a review

of the administrative record of proceedings before the Commissioner.  See Whitzell v. Astrue,

792 F. Supp. 2d 143, 147 (D. Mass. 2011) (quoting 42 U.S.C. § 405(g)).  If a claimant presents

new evidence to the court that was not contained within the administrative record, the court may

not consider it.  "If additional evidence is to be considered, it must be by way of remand[]"

pursuant to sentence six of Section 205(g).  <u>Hamilton v. Sec'y of Health & Human Servs.</u>, 961

F.2d 1495, 1503 (10th Cir. 1992) (Kane, J., concurring).  Sentence six permits the court to

remand a case to the Commissioner for further proceedings and order the evidence to be added to

the record for consideration.  <u>See</u> 42 U.S.C. § 405(g) ("The court may . . . at any time order

additional evidence to be taken before the Commissioner . . . but only upon a showing that there

is new evidence which is material and that there is good cause for the failure to incorporate such

evidence into the record in a prior proceeding.").

Under section 205(g), sentence four, this Court's review of the Commissioner's decision

is "limited to determining whether the ALJ used the proper legal standards and found facts upon

the proper quantum of evidence."  <u>Ward v. Comm'r of Soc. Sec.</u>, 211 F.3d 652, 655 (1st Cir.

2000).  In conducting such review, the Court must defer to the Commissioner's factual findings,

so long as such findings are "supported by substantial evidence," but the court's review of the

Commissioner's conclusions of law is *de novo*.  <u>Id.</u>; <u>see also</u> <u>Nguyen v. Chater</u>, 172 F.3d 31, 35

(1st Cir. 1999) ("The ALJ's findings of fact are conclusive when supported by substantial

evidence . . . but are not conclusive when derived by ignoring evidence, misapplying the law, or

judging matters entrusted to experts.").

> Under the substantial-evidence standard, a court looks to an existing administrative
> record and asks whether it contains sufficien[t] evidence to support the agency's
> factual determinations.  And whatever the meaning of "substantial" in other
> contexts, the threshold for such evidentiary sufficiency is not high.  Substantial
> evidence, this Court has said, is more than a mere scintilla.  It means—and means
> only—such relevant evidence as a reasonable mind might accept as adequate to
> support a conclusion.

<u>Biestek v. Berryhill</u>, 139 S. Ct. 1148, 1154 (2019) (alteration in original) (internal quotation

marks and citations omitted).  The Court "must affirm the [Commissioner's] resolution, *even if*

*the record arguably could justify a different conclusion*, so long as it is supported by substantial evidence." Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987) (emphasis added) (citing Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981)).

## III.    DISCUSSION

Claimant asserts that the ALJ's decision should be reversed because she improperly evaluated the opinions of record, particularly those of Claimant's treating physicians, Dr. Duncan[6] and Dr. Peli, and that the RFC finding—that he could perform medium work except that he could occasionally perform tasks that require precise near acuity, precise depth perception, or peripheral vision—is unsupported by the record.  See generally [ECF Nos. 14, 22]. The Acting Commissioner, in turn, contends that the ALJ's decision should be affirmed because she correctly applied the law and the decision was supported by substantial record evidence.  See generally [ECF No. 21].  As explained below, the Court finds that Claimant's stated grounds for reversal are without merit and therefore affirms the ALJ's decision.

Claimant takes issue with the fact that the ALJ partially discredited each medical opinion on the record, but, although an ALJ must consider the medical opinions in the case record, she need not give "any evidentiary or controlling weight" to the opinions of primary or treating physicians.  Tucker v. Kijakazi, No. 21-cv-10317, 2022 WL 18032978, at *13 (D. Mass. Sept. 30, 2022).  In assessing an RFC, an ALJ has the authority to "piece together the relevant medical facts from the findings and opinions of multiple physicians."  Evangelista v. Sec'y of Health & Hum. Servs., 826 F.2d 136, 144 (1st Cir. 1987); accord Ramos v. Barnhart, 119 F. App'x 295,

---

[6] At times, Claimant's brief refers to a "Dr. Hudson."  See [ECF No. 14 at 9, 14].  There is no Dr. Hudson mentioned in the record and as best as the Court can tell, Claimant meant to refer to Dr. Duncan.

297 (1st Cir. 2005).  "An applicant's residual functional capacity is, after all, an administrative

finding reserved to the Commissioner."  Purdy v. Berryhill, 887 F.3d 7, 14 (1st Cir. 2018); 20

C.F.R. §§ 416.927(d)(2), 416.946.

 Despite Claimant's arguments to the contrary, there is ample support in the record for the

ALJ's RFC determination.  Additionally, the Court finds that she did not err in making her

credibility assessments of Drs. Peli and Duncan.

 First, Claimant argues that the ALJ failed to provide adequate support for her conclusion

that Dr. Peli's opinion was "partially persuasive" and that the limited explanation she did provide

is rooted in mistakes of fact.  [ECF No. 14 at 8–14].  Neither argument succeeds.

 An ALJ must evaluate the relative persuasiveness of the medical evidence using a range

of factors set out in 20 C.F.R. § 404.1520c(c).  See Tucker, 2022 WL 18032978, at *13 (These

factors include "supportability, consistency, characteristics of the medical source's relationship

with the claimant, the medical source's specialization relative to the claimant's condition, and

other factors that tend to support or contradict a medical opinion." (citations and quotation marks

omitted)); 20 C.F.R. § 404.1520c(c)(1)–(5).  In most cases, an ALJ need only discuss the most

important factors, supportability and consistency.  Tucker, 2022 WL 18032978, at *13 (quoting

Giovanna v. Kijakazi, No. 20-cv-00421, 2021 WL 3362569, at *3 (D.R.I. Aug. 3, 2021)).

 The ALJ sufficiently explained her consideration of Dr. Peli's findings with reference to

both the record evidence supporting Dr. Peli's assessment and other record evidence

corroborating his assessment.  See [R. 24 (stating that she found Dr. Peli's opinion to be

"partially persuasive because it is generally consistent with the [C]laimant's history of effective

treatment for his visual impairments, his limited findings upon objective testing and diagnostic

studies, and his reasonable range of reported daily activities")].  Dr. Peli treated Claimant in

November 2020 following his glaucoma surgery.  [R. 23].  He conducted an eye exam, in which

he determined, as the ALJ noted in her decision, that Claimant's field of vision was "full by

confrontation and also showed full [confrontation] on last 24-2" and that Claimant "reportedly

described blurry vision, with normal reading and an ability to read 20/30."  [Id.].  Dr. Peli

described Claimant's condition as "mild and moderate" and that he was "easily qualified for

driving" aside from the suggestion to avoid night driving.  [Id.].  These findings are consistent

with record evidence from Claimant's other treating ophthalmologists at the New England Eye

Center.  During post-operative visits in October 2020, which the ALJ documented in her opinion,

see [R. 22–23], ophthalmologists at the New England Eye Center noted that his post-procedure

intraocular pressure was "great," [R. 22], and that, by October 7, 2020, his intraocular pressure

was stable, and, by the end of October, it had improved further, [R. 23].  Those same doctors

advised him that he was "able to work from an ophthalmic standpoint and [they were] no longer

able to provide extended work letters unless his clinical picture changes."  [Id.].  This is

consistent with Dr. Peli's notation that Claimant is "unlikely to be eligible [for SSI] based on

vision[.]" [Id.].[7]

---

[7] Claimant contends that the ALJ did not reference this last fact when crediting the opinion of Dr.
Peli, [ECF No. 22 at 2], but the ALJ did recount this fact in her summary of Dr. Peli's findings,
see [R. 23].  Claimant further avers that the ALJ could not have properly relied on this fact
because the ultimate issue of disability is a decision reserved for the ALJ.  See [ECF No. 22 at
3]; Sexton v. Barnhart, 247 F. Supp. 2d 15, 24 (D. Mass. 2003).  While it is true that an ALJ is
not required to accept the conclusions of the claimant's treating physicians on the ultimate issue
of disability, see Sitar v. Schweiker, 671 F.2d 19, 22 (1st Cir. 1982), there is no evidence that the
ALJ did so here and there is nothing in the case law that suggests an ALJ may not consider this
fact among others, especially where it is supported by other facts in the record.

Moreover, while the ALJ must consider all available evidence, she is "not obligated to discuss
every bit of evidence."  Frost v. Barnhart, 121 F. App'x 399, 400 (1st Cir. 2005) (per curiam).
Rather, "there is a presumption that the ALJ has considered all of the evidence before [her]."
Quigley v. Barnhart, 224 F. Supp. 2d 357, 369 (D. Mass. 2002); accord Scott v. Saul, No. 19-cv-
12552, 2021 WL 735851, at *4 (D. Mass. Feb. 25, 2021).

Also unavailing is Claimant's contention that the ALJ mischaracterized the record by finding that Dr. Peli's "status as [his] treating ophthalmologist places her in a strong position positive to evaluate his work-related abilities and limitations," [R. 24], because Dr. Peli had not treated Claimant prior to this November 24 examination, [ECF No. 14 at 11].  Nothing about the ALJ's statement, however, purports to rely on the length of the relationship between Dr. Peli and Claimant.  The ALJ is entitled to attribute weight at her discretion to a treating physician's opinion based on her review of the record.  That she found Dr. Peli to be in a strong position to evaluate his limitations as a treating ophthalmologist, even during this initial visit, is within her discretion and does not amount to "clearly mistaken evidence."  Biestek, 139 S. Ct. at 1160 (Gorsuch, J., dissenting).

The Court also finds that the ALJ did not err in declining to attribute any weight to Dr. Duncan's opinion.  "[I]t is well settled that an ALJ is not obligated to accept a treating physician's conclusions."  Hill v. Colvin, No. 13-cv-11497, 2015 WL 132656, at *7 (D. Mass. Jan. 9, 2015) (citing Guyton v. Apfel, 20 F. Supp. 2d 156, 167 (D. Mass. 1998)).  Medical opinions "without support evidence, or one that is inconsistent with evidence from other sources, [is] not persuasive . . . regardless of who made the medical opinion."  Harrison v. Saul, 20-cv-10295, 2021 WL 1153028, at *5 (D. Mass. March 26, 2021) (citing Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844, 5854); Brocklesby v. Kijakazi, No. 20-cv-10113, 2021 WL 8316260, at *12 (D. Mass. Oct. 25, 2021).  As Claimant's primary care physician, Dr. Duncan did not make any specific findings about Claimant's vision issues apart from generally noting that his limitations were due to "glaucoma with severe left eye vision loss" and then referring him to a specialist. [R. 355, 391, 700].  Indeed, it was Dr. Duncan who referred Claimant to the treating ophthalmologists on the record, whose detailed opinions on Claimant's conditions the ALJ found more persuasive.  Regarding the supportability of medical opinions,

courts have found that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." Rivera v. Kijakazi, No. 21-cv-30037, 2022 WL 4586469, at *3 (D. Mass. Sept. 29, 2022) (quoting 20 C.F.R. §§ 404.1520c(c)(1); 416.920c(c)(1)).  With that in mind, the ALJ's decision to attribute less weight to Dr. Duncan's opinion than that of the treating ophthalmologists is reasonable.  "The Court's job is not to examine the record to determine if it could support an alternate finding," Rivera, 2022 WL 4586469, at *7, but to review the record and determine whether "a reasonable mind . . . could accept it as adequate to support [her] conclusion," id. (quoting Purdy, 887 F.3d at 13).

Claimant's chief concern is that the ALJ erred in not giving controlling weight to Dr. Duncan's opinion that he would be off-task for more than 25% of the workday, [R. 700], but the ALJ adequately explained why she found this determination unreliable in light of all surrounding evidence indicating the Claimant's history of successful treatment through medication and surgery, the other medical findings on the record, and Claimant's wide reported range of daily activities.  [R. 24–25 (Activities noted by the ALJ included his ability to "attend to personal care tasks, prepare simple meals, clean up, wash dishes, do laundry, take out trash, drive a vehicle, shop for groceries, handle finances, watch television, gardening/grow vegetables, and attend his medical appointments.").

With regard to his range of daily activities, Claimant argues that the ALJ erroneously emphasized the list of activities he can perform, but failed to consider his testimony about how his condition interfered with those activities even after surgery, including that he had difficulty driving and struggled with balance and depth perception that interrupted his ability to walk and

bend and do activities "at a normal pace." [ECF No. 13 at 11–12]. Claimant avers that the ALJ "conveniently failed" to consider this testimony, [id. at 12], but the ALJ did no such thing. She wrote "[a]lthough the [C]laimant has at times described a more limited range of daily activity, I found that two factors weigh against considering these allegations to be strong." [R. 25]. She subsequently described that she decided to attribute less weight to this testimony because "the allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty" and "even if the [C]laimant's daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to the [C]laimant's medical condition, as opposed to other reasons, in view of the relatively weak medical evidence and other factors discussed in this decision." [Id.]. She then reasonably concluded that "[o]verall, I find that the [C]laimant's reports of limitation in his daily activities are outweighed by the other factors discussed throughout this decision." [Id.].

Therefore, the ALJ did not engage in improper cherry-pecking as Claimant suggests. See Raposo v. Berryhill, 17-cv-10308, 2018 WL 1524570, at *8 (D. Mass. Mar. 28, 2018). And, while the performance of daily activities does not necessarily equate to an ability to work, "evidence of daily activities can be used to support a negative credibility finding." Teixeira v. Astrue, 755 F. Supp. 2d 340, 347 (D. Mass. 2010). That Claimant reports that he had difficulty completing these activities at a "normal pace," [ECF 14 at 12 (citing [R. 75])], does not prevent the ALJ from using his performance of these daily activities as one factor in assessing credibility.[8]

---

[8] Claimant also avers that the ALJ erred in failing to adequately explain why she rejected the opinions of Drs. Mika and Hom, [ECF No. 14 at 10], but does not make any real attempt at explaining why this purported procedural error was harmful, see Shinseki v. Sanders, 556 U.S. 396, 409 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination."). Although the ALJ's determination—that the

Finally, the record is devoid of any medical findings to support that Claimant has any limitations related to his "cat scratch," hip pain/sciatica, or any other medical issue beyond his vision.

In sum, while Claimant contends that the ALJ failed to articulate any reasons for her RFC finding, see [ECF Nos. 14 at 10], the Court finds the decision more than met the "minimum level of articulation" to allow this Court to review her disability determination and find that her determination is adequately supported by the record, see Martinez v. Kijakazi, No. 20-CV-30151, 2021 WL 5054477, at *9 (D. Mass. Oct. 29, 2021); Biestek, 139 S. Ct. at 1154.  Based on the record in this case, the ALJ was entitled to make a "common-sense judgment[]" that Claimant's vision conditions did not prevent him performing the types of work described in the RFC and the jobs identified by the VE.  Purdy, 887 F.3d at 14 (quoting Gordils v. Sec'y of Health & Human Servs., 921 F.2d 327, 329 (1st Cir. 1990)).

## IV.   CONCLUSION

For the reasons stated above, the Court finds that the ALJ's decision was supported by substantial evidence and therefore Claimant's motion to reverse and remand, [ECF No. 13], is DENIED and the Acting Commissioner's motion to affirm is GRANTED, [ECF No. 20].

**SO ORDERED.**

March 3, 2023                                              /s/ Allison D. Burroughs
                                                          ALLISON D. BURROUGHS
                                                          U.S. DISTRICT JUDGE

---

assessments of Drs. Mika and Horn are unpersuasive because they are inconsistent with the record as a whole and that those doctors did not "have access to a full longitudinal view" of the record—is minimal, [R. 24], because she merely rejected the doctors' shared view that the Claimant's impairment was actually not "severe," remand on this basis "will amount to no more than an empty exercise" as it would not change the outcome, Ward, 211 F.3d at 656.